STEVEN G. KALAR
Federal Public Defender
Northern District of California
DAVID W. RIZK
Assistant Federal Public Defender
19th Floor Federal Building - Box 36106
450 Golden Gate Avenue
San Francisco, CA 94102
Telephone:    (415) 436-7700
Facsimile:    (415) 436-7706
Email:        David_Rizk@fd.org


Counsel for Defendant SANDIFER

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | **Case No.:** CR 19–00518 VC |
| Plaintiff, | **DEFENDANT'S SENTENCING MEMORANDUM AND REQUEST FOR DOWNWARD VARIANCE** |
| v. | |
| JONTAE SANDIFER, | |
| Defendant. | **Hearing Date:**    January 7, 2021 |
| | **Hearing Time:**    2:00 p.m. |

i

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................................ iii

I.      INTRODUCTION ........................................................................................................... 1

II.     FACTUAL BACKGROUND ........................................................................................... 2

III.    SENTENCING GUIDELINES ........................................................................................ 5

IV.     LEGAL STANDARD ...................................................................................................... 7

V.      ARGUMENT .................................................................................................................. 8

        A.  The Career Offender Guideline is Not Based on Empirical Evidence and is Not
            Followed by Most Sentencing Courts. .......................................................................... 8

        B.  The Career Offender Guideline Does Not Protect Public Safety, Promotes Racial
            Disparities, and Should Not Be Afforded Much Weight. ........................................ 12

        C.  Seriousness of the Offense, Respect for the Law, and Just Punishment ................... 15

        D.  Deterring Criminal Conduct and Protecting the Public. ........................................... 18

        E.  Providing Training, Medical Care or Other Treatment. ............................................ 20

        F.  Avoiding Unwarranted Sentencing Disparities. ....................................................... 22

VI.     CONCLUSION .............................................................................................................. 23

# TABLE OF AUTHORITIES

**Federal Cases**

*Finch v. United States*,
2020 WL 2079301 (D. Mass. Apr. 20, 2020) ................................................. 10

*Gall v. United States*,
552 U.S. 38 (2007) ......................................................... 7, 8, 15, 23

*Kennedy v. Louisiana*,
554 U.S. 407 (2008) ........................................................... 15

*Peugh v. United States*,
569 U.S. 530 (2013) ........................................................... 11

*Rita v. United States*,
551 U.S. 338 (2007) ............................................................ 8

*Spears v. United States*,
555 US 261 (2009) ............................................................. 8

*Tapia v. United States*,
564 U.S. 319 (2011) ........................................................... 15

*United States v. Amezcua-Vasquez*,
567 F.3d 1050 (9th Cir. 2009) ................................................. 23

*United States v. Bad Marriage*,
392 F.3d 1103 (9th Cir. 2004) ................................................. 20

*United States v. Barker*,
771 F.2d 1362 (9th Cir. 1985) ................................................. 7

*United States v. Boardman*,
528 F.3d 86 (1st Cir. 2008) ................................................... 10

*United States v. Booker*,
543 U.S. 220 (2005) ......................................................... 8, 9

*United States v. Carty*,
520 F.3d 984 (9th Cir. 2008) (en banc) ........................................ 7

*United States v. Casarez-Bravo*,
181 F.3d 1074 (9th Cir. 1999) ................................................. 6

*United States v. Charles*,
581 F.3d 927 (9th Cir. 2009) ................................................ 5-6

*United States v. Corner*,
598 F.3d 411 (7th Cir. 2010) (en banc) ....................................... 10

*United States v. Hubbard,*
    369 F. Supp. 2d 146 (D. Mass. 2005) ........................................................ 10

*United States v. Lee,*
    704 F.3d 785 (9th Cir. 2012) ..................................................................... 6

*United States v. Martin,*
    520 F.3d 87 (1st Cir. 2008) ........................................................................ 9

*United States v. Mitchell,*
    624 F.3d 1023 (9th Cir. 2010) ............................................................. 10, 11

*United States v. Ochoa-Oregel,*
    904 F.3d 682 (9th Cir. 2018) ..................................................................... 6

*United States v. Person,*
    377 F. Supp. 2d 308 (D. Mass. 2005) ........................................................ 10

*United States v. Sanchez,*
    517 F.3d 651 (2d Cir. 2008) ...................................................................... 10

*United States v. Stewart,*
    761 F.3d 993 (9th Cir. 2014) ..................................................................... 10

*United States v. Valdez,*
    77 F. Supp. 3d 1115 (D.N.M. 2014) .......................................................... 10

*Williams v. New York,*
    337 U.S. 241 (1949) ................................................................................... 7

**Federal Statutes**

18 U.S.C. § 3553 ................................................................................... *passim*

28 U.S.C. § 994 .................................................................................... 8, 9

**State Statutes**

California Penal Code § 245 ......................................................................... 17

Health & Safety Code § 11351.5 ................................................................ 5, 6

Health & Safety Code § 11352 ..................................................................... 6

Health & Safety Code § 11360 ..................................................................... 6

**Other**

U.S.S.G. § 2D1.1 ....................................................................................... 11

U.S.S.G. § 2K2.1 ................................................................................... 6, 11

U.S.S.G. § 4B1.1 ................................................................................. 5, 6, 7

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## I.     INTRODUCTION

Defendant Jontae Sandifer will be before the Court for sentencing in this case from the Tenderloin. In early August of last year, Mr. Sandifer, a longtime heroin and cocaine user, purchased what he thought was heroin but turned out to be fentanyl from somebody on the street. He became ill when he ingested it and had to go to the hospital. When Mr. Sandifer later ran into the dealer on the street, they argued, and the dealer threatened Mr. Sandifer and then stalked off across the street. Disinhibited as a result of his drug use that day, and paranoid and hypervigilant after surviving a lifetime of violence, Mr. Sandifer grabbed a gun from his car and fired off a warning shot. The seller was not hit, walked away, and thankfully nobody was hurt. Later, police located the gun and approximately 14 grams of heroin in Mr. Sandifer's car. At the time, Mr. Sandifer had been using drugs several times a day and living in his car.

In custody, Mr. Sandifer got sober and took responsibility for his actions. It appears that Mr. Sandifer's behavior was partially due to the physical abuse he experienced as a child and a series of violent crimes he suffered throughout his life. He exhibits degrees of hypervigilance, and untreated symptoms of posttraumatic stress syndrome (PTSD) and depression, according to a recent neuropsychological evaluation. *See* Rizk Decl., Ex. A (neuropsychological evaluation). Now sober and taking stock of himself, his life, and behavior in this case, Mr. Sandifer blames himself. He recognizes that although the difficulties he has experienced over his lifetime have been massively deranging, his behavior cannot be attributed just to his drug use and traumatized mindset. He is now trying to ascertain how to put his life back together.

Mr. Sandifer has taken responsibility despite facing *very* harsh consequences. He concedes that he qualifies as a career offender under the U.S. Sentencing Guidelines because he was convicted of crack cocaine sales twice in his twenties. As with the instant offense, those convictions and all of his past criminal history were driven by drug abuse. This is his first conviction for a gun. The most time in custody Mr. Sandifer has actually previously served is just two years. Based solely on application of the career offender Guideline, however, the government and U.S. Probation recommend a sentence of nearly 22 years—an *extremely* draconian punishment that might be appropriate in other circumstances, for example, if Mr. Sandifer had intentionally attempted to kill someone. That

allegation has never been at play in this case, however, and an attempted murder sentence is not right here. Moreover, the career offender Guideline itself has been the subject of criticism for many years and has been rejected by many courts as overly harsh. U.S. Sentencing Commission data from across the Ninth Circuit since 2010 for career offenders who plead guilty to § 924(c), as well as either drug or gun charges, and were facing a five-year mandatory minimum, shows that such defendants received sentences of between roughly five and 12.5 years. In recognition that Mr. Sandifer has committed a serious crime, the defense recommends a sentence at the higher end of this scale. Mr. Sandifer respectfully asks the Court to impose a sentence of 138 months (i.e., 11.5 years), followed by three years of supervised release and, without objection, the conditions recommended in the PSR. With credit for time served, this leaves roughly a ten-year sentence yet to be served by Mr. Sandifer. He submits this is ample punishment to satisfy the § 3553(a) factors.

The past year and a half that Mr. Sandifer has spent at Santa Rita Jail in difficult conditions during the COVID-19 pandemic, sober, and gaining insight into the extent of his personal problems and considering the consequences of his actions, has already had a very significant impact on him. Thankfully, Mr. Sandifer has a supportive family that has rallied around him and put together a release plan that will provide employment, keep him under family supervision, distance him from drugs, and afford him the treatment he desperately needs. He pleads before the Court now for a sentence of 138 months, which will enable him to return to his family before many more years pass.

## II. FACTUAL BACKGROUND

Mr. Sandifer was born to Latonya Sandifer and Joel Sandifer in Oakland on November 6, 1980. PSR ¶ 52. Mr. Sandifer's upbringing in East Oakland was extremely difficult due to the rampant violence and drugs in the neighborhood. *Id.* ¶ 53. Although his mother attempted to shelter Mr. Sandifer as a young boy, she was largely unable to do so as a result of her work schedule, working two jobs to provide for the family. Rizk Decl., Ex. A at 2. Mr. Sandifer's father was physically and emotionally abusive of Mr. Sandifer as well as his mother. *Id.* at 5; PSR ¶ 54. Mr. Sandifer recalls being beaten by his father with a belt, an extension cord, and a broom, on various different occasions during his childhood. *Id.* Mr. Sandifer also reports that he first saw his father hit his mother around age four, which left Mr. Sandifer with significant, permanent emotional trauma: "I was so messed up

by it. That was always something that was there. I remember it like it was yesterday." *Id.* Further

contributing to the violence at home, his father was also an alcoholic and addicted to crack cocaine,

something Mr. Sandifer began to realize at around age six, when he learned to recognize when his

father was intoxicated. *Id.*; *see also* PSR ¶ 54. His mother tried to preserve some semblance of a

relationship between Mr. Sandifer and his father throughout his upbringing, despite his father's drug

use and abusive behavior. Rizk Decl., Ex. A at 3. Today, unfortunately, Mr. Sandifer has no

meaningful relationship with his father, who reportedly continues to abuse drugs and alcohol on the

street even in his sixties. *Id.* at 10.

Mr. Sandifer was a good student in elementary school, despite the chaotic conditions at home

and around him. *Id.* at 10. He began to struggle academically in middle school due to the "rough"

environment. *Id.* His mother confirms that at about age 13 or 14, he started to have difficulty in

school and was bullied. *Id.* at 3. On one occasion, Mr. Sandifer was punched and knocked out by

another student, which ultimately resulted in his transferring to a different school mid-term. *Id.* The

incident left a lasting impression on Mr. Sandifer:

> He reported that as a result of this incident and the violence at home (see below), he was "quick to fight. I wasn't trying to get knocked out again." Mr. Sandifer said, "I grew up feeling like I've been fighting since I was young. Fighting to survive." He explained that the neighborhoods in East Oakland where he stayed and grew up were violent and he was exposed to drug use and sales. He also noted that he has always been small in stature and had to "learn to stand my ground, fight, not be bullied."

*Id.* Around the same time, Mr. Sandifer also began physically intervening to protect his mother from

his father at home. *Id.* at 5; PSR ¶ 54. During this period, his father's abuse escalated. On one

occasion that Mr. Sandifer vividly recalls, his mother called her sister, a nurse, for assistance with

Mr. Sandifer's math homework. In response, his father, perceiving it as an affront to his own

intelligence, struck Mr. Sandifer's mother in the face, splattering blood over Mr. Sandifer's

schoolbooks. Rizk Decl., Ex. A at 5-6; PSR ¶ 55. On another occasion, Mr. Sandifer physically

intervened to defend his mother from an attack by his father, striking his father in the head with a

basketball trophy from school—for which his father's family blamed Mr. Sandifer and never forgave

him. Rizk Decl., Ex. A at 6, 14; PSR ¶ 54. As U.S. Probation relates:

> Retrospectively, the defendant noted he felt embarrassed about his father and the abuse he and his mother endured. He noted he was embarrassed of his father because everyone in the

neighborhood knew what was going on, and knew his father was a drug addict. Overall, the
defendant felt weak due to not having protection from his father. Due to the lack of protection,
the defendant noted he felt as he had to step up to provide protection for himself and his
mother.

PSR ¶ 56. The impact on Mr. Sandifer is also very apparent from his own letter to the Court. Rizk

Decl., Ex. C. The police came repeatedly to the house, and on at least one occasion the elder Sandifer

was arrested and jailed, but the violence continued. Rizk Decl., Ex. A at 6. Around this time, when

Mr. Sandifer was approximately 14 years old, his mother finally left his father. *Id.* at 2. Mr. Sandifer

was distraught over the separation, according to his mother. *Id*. at 6. Despite the separation, Mr.

Sandifer continued to see his father—sometimes in the streets and behind his mother's back—in an

effort to maintain a relationship, and in any case, the separation with his mother did not end the

physical violence and threats directed at the family. *Id.* The elder Sandifer continued to abuse his son

and stalk Ms. Sandifer. *Id.*

Devastating violence also pervaded East Oakland during this era. When Mr. Sandifer was age

four or five, one of his mother's sisters, aged 22, was raped and murdered in a nearby park. *Id.* He

recalls his mother breaking down upon hearing the news, and then having to tell her sister's four-

year-old son that his mother was gone. *Id*. Mr. Sandifer had nightmares and nobody in the family

slept for weeks. *Id.* As he grew up, Mr. Sandifer was routinely confronted by extreme violence in his

regular life, repeatedly personally witnessing friends being shot and killed. He recounted two such

gruesome and deeply traumatizing incidents to the neuropsychiatrist who evaluated him and relayed

that he has had so many friends killed that it is "too many to count. So many people each year, since

I was young." *Id.* at 6-7. Two years ago, Mr. Sandifer himself was shot during an attempted

carjacking that left him terrified and motivated him to carry a gun for protection—rather than getting

emotional support and counseling—a response he now deeply regrets. *Id.* His mother also regrets

that all of this violence left Mr. Sandifer vigilant and paranoid, and that she did not assist him in

getting help earlier. *Id.* Mr. Sandifer has never seen a therapist but would now greatly appreciate the

opportunity for such help, and recognizes he desperately needs it. *Id.* at 7-8; PSR ¶ 63.

Without access to greater support or counseling, Mr. Sandifer turned to drugs instead at a very

young age. He started drinking alcohol and smoking marijuana around age 13 or 14, which almost

immediately became a daily habit. Rizk Decl., Ex. A at 8; PSR ¶ 64. Drugs were in the home, unfortunately, and he stole alcohol from family members. Rizk Decl., Ex. A at 8. At age 16, he became addicted to cocaine and by his early twenties he was using marijuana, cocaine, and heroin daily. *Id.* Mr. Sandifer has abused all three drugs daily for nearly twenty years, up until (and on) the date of the instant offense. *Id.* Although Mr. Sandifer has not been successful in staying clean in prior rehabilitation programs, he wants assistance, and is hopeful that after a period of sobriety while he serves his sentence, he will be better equipped to remain clean. Since entering Santa Rita Jail, he has been unable to participate in substance abuse counseling due to the COVID-19 pandemic. PSR ¶ 65. Currently, however, he reports that he feels much better sober: "My body is feeling better and I feel better about myself." Rizk Decl., Ex. A at 9.

Despite his drug use, Mr. Sandifer has maintained personal relationships with the mother of his son, as well as his son, who lives in Sacramento. PSR ¶ 57. He has had more difficulty maintaining a relationship with his daughter because his daughter's mother does not want her to have contact with him. Rizk Decl., Ex. A at 4. Mr. Sandifer also was in a relationship and working at the YMCA until near the time of his arrest. *Id.* at 4, 10. However, he hid his drug problem from his partner and his employer. *Id.* When his partner found out about his drug use, the relationship deteriorated, and then his arrest cost him his job. *Id.* Despite his serious mistakes, Mr. Sandifer continues to have contact with a wide array of family members, some of whom have written to the Court in support of Mr. Sandifer, despite his crime. *See id.* at 4-5; *see also id.,* Ex. B (letters of support). Mr. Sandifer's mother, as well as his brother, would accept Mr. Sandifer to live with them if he were released. *Id.,* Ex. A at 4. He hopes to live with his brother near Sacramento upon release, in order to stay away from the Bay Area and find employment with his brother's help. *Id.*

## III.   SENTENCING GUIDELINES

Mr. Sandifer pled guilty pursuant to a plea agreement in this case and therefore stipulates that the Guideline sentence is 262-327 months under the career offender Guideline, U.S.S.G. § 4B1.1(b)(3). He acknowledges that the career offender Guideline applies because, among other things, the instant conviction under § 924(c) qualifies as a "crime of violence" (equally, § 841(a)(1) is a "controlled substance offense"), and he has two prior convictions for violations of Health & Safety

Code § 11351.5. *See United States v. Charles*, 581 F.3d 927, 934 (9th Cir. 2009) ("We hold that a [sic] prior conviction under § 11351.5 constitutes a controlled substance offense for the purpose of determining whether a defendant qualifies as a career offender under § 4B1.1."). Those two state convictions occurred when Mr. Sandifer was 26 and 29 years old, respectively.[1] PSR ¶¶ 37-38. He received three and four years prison those cases, respectively. *Id.* Mr. Sandifer actually served approximately two years for the earlier offense, the most he has ever served in his life. *Id.* ¶ 37.

However, as set forth below, Mr. Sandifer believes that the career offender Guideline drastically overstates the appropriate punishment in this case. Significantly, if Mr. Sandifer did not qualify as a career offender, his "natural" Guidelines would result in a much lower recommended range. In particular, U.S. Probation calculates his Base Offense Level (BOL) as 24, due to Mr. Sandifer's prior "controlled substance offenses," noted above. PSR ¶ 22 (citing U.S.S.G. § 2K2.1(a)(2)). Thus, even without the career offender enhancement, the BOL of 24 calculated in the PSR is already significantly increased by 10 levels to account for his two qualifying prior convictions (up from a BOL of 14 without those two priors). U.S.S.G. § 2K2.1(a)(6). The PSR goes on to calculate his Adjusted Offense Level (AOL) for Counts 1 and 3 (e.g., §§ 841(a) and 922(g)) as 28, which includes an additional enhancement for possessing the firearm in connection with another felony and discharging it. *See* PSR ¶ 23. Finally, the PSR adds a 4-level increase because Mr. Sandifer qualifies as a career offender and grants him a 3-level decrease for Acceptance of Responsibility. PSR ¶¶ 28-30. Thus, without the career offender enhancement to the offense level, Mr. Sandifer's Total Offense Level (TOL) for Counts 1 and 3 would be 25, rather than 29.

Mr. Sandifer further agrees with the PSR's criminal history calculation, which absent a Career offender designation, places him in Criminal History Category (CHC) V. PSR ¶¶ 40-41. Here the career offender designation penalizes him again: with it, his criminal history category increases even

---

[1] His marijuana conviction for a violation of Health & Safety Code § 11360(a) does not qualify under the career offender Guideline, nor does his prior conviction for a violation of Health & Safety Code § 11352(a), as both statutes are overbroad under a categorical analysis. *United States v. Casarez-Bravo*, 181 F.3d 1074, 1077-78 (9th Cir. 1999); *United States v. Lee*, 704 F.3d 785, 789-90 (9th Cir. 2012). Mr. Sandifer's only other conviction, a domestic violence misdemeanor for which he received a probationary sentence, also does not constitute a qualifying "crime of violence." *See United States v. Ochoa-Oregel*, 904 F.3d 682, 684 (9th Cir. 2018) (so holding for purposes of removal). Thus, but for his two prior convictions under § 11351.5, Mr. Sandifer would not be considered a career offender.

further, to CHC VI. *Id.*

Finally, and arguably nonsensically, where the conviction involves a violation of § 924(c), the TOL and CHC do not actually matter under the career offender Guideline. Instead, the career offender Guideline is driven solely by the fact of the § 924(c) conviction, and whether or not the defendant receives Acceptance of Responsibility. *See* U.S.S.G. § 4B1.1(c)(3) (table). Here, the mere fact of the § 924(c) conviction and Mr. Sandifer's full acceptance of responsibility results in a Guideline sentence of 262-327 months. *Id.* By contrast, however, the "natural" Guideline sentence— without all of the multiple compounding career offender enhancements—would be, for TOL 25 and CHC V, 100-125 months.[2] On top of this, the mandatory minimum of 60 months for Count 2 results in a "natural" range of 160-185 months under the Guidelines. Mr. Sandifer believes this range, although still extremely high and ultimately too harsh, is at least less arbitrary and more in line with the rest of the U.S. Sentencing Guidelines, and thus a more appropriate point of reference for the Court to consider when sentencing.

## IV.   LEGAL STANDARD

Criminal "punishment should fit the offender and not merely the crime." *Williams v. New York*, 337 U.S. 241, 247 (1949). That requires "the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue." *Gall v. United States*, 552 U.S. 38, 52 (2007) (quotations omitted). The factors detailed in 18 U.S.C. § 3553(a) assist the Court in fulfilling this mandate to make "an individualized assessment of a particular defendant's culpability rather than a mechanistic application of a given sentence to a given category of crime." *United States v. Barker*, 771 F.2d 1362, 1365 (9th Cir. 1985). The sentence recommended in the Sentencing Guidelines is only one factor for district courts to consider in making this judgment, and it may not be weighed more heavily than any other § 3553(a) factor. *Gall*, 552 U.S. at 50; *see also United States v. Carty*, 520 F.3d 984, 991 (9th Cir. 2008) (en banc).

---

[2] Note that the PSR concludes in paragraph 78 that the Guideline sentence for Counts 1 and 2, with TOL 29 and CHC VI, would be 151-188 months—but again, that includes the career offender enhancements to both the offense level (from 25 to 29) and criminal history category (from CHC from V to VI). *See* PSR ¶¶ 28, 32.

Under *United States v. Booker*, 543 U.S. 220 (2005), the sentencing court must impose the lowest reasonable sentence that fulfils the goals of Congress, unencumbered by offense levels, criminal history, or the availability of authorized downward departures. While the Court may apply a presumption of reasonableness to sentences within the applicable guideline range, the district court "does not enjoy the benefit of a legal presumption that the Guidelines sentence should apply." *Rita v. United States*, 551 U.S. 338, 351 (2007). Nor is it required to use a formulaic approach yielding a mathematical justification of non-Guidelines sentences. *See Gall*, 558 U.S. at 49. Rather, it must exercise "reasoned sentencing judgment, resting upon an effort to filter the Guidelines' general advice through § 3553(a)'s list of factors." *Rita*, 551 U.S. at 358.

## V.   ARGUMENT

### A.   The Career Offender Guideline is Not Based on Empirical Evidence and is Not Followed by Most Sentencing Courts.

The career offender Guideline was not adopted based on empirical research and should be rejected on policy grounds. When the Sentencing Commission fails to fulfill its institutional role, a district court can vary from the Guidelines "based on *policy* disagreement with them, and not simply based on an individualized determination that they yield an excessive sentence in a particular case." *Spears v. United States,* 555 US 261, 265 (2009). In *Rita*, the Supreme Court explained that it may be "fair to assume" that the Guidelines "reflect a rough approximation" of sentences that "might achieve § 3553(a)'s objectives," because the original Sentencing Commission based the Guidelines on an empirical study of average time served before the Guidelines, and because the Guidelines can evolve in response to sentencing data, feedback from judges, practitioners and experts, and penological research. 543 U.S. at 348-50.

The career offender Guideline, however, was not developed in this manner. It was initially based upon a congressional directive requiring the Sentencing Commission to set Guidelines ranges at or near the statutory maximum for certain specifically described repeat violent and/or drug offenders. 28 U.S.C. § 994(h). Instead of relying upon an empirical approach, the Sentencing Commission simply keyed offense levels to statutory maximum sentences and, at the same time, swept many into the career offender classification who were not the repeat violent and drug offenders

targeted by Congress. The Sentencing Commission then failed to incorporate feedback from the courts or its own empirical research. Indeed, the Sentencing Commission broadened the reach of the guideline, while failing to heed the sentencing data and complaints from judges and others in the field, failing to conduct empirical research, and failing to provide reasons for its actions. Almost 10 years before *Booker*, a study of downward departures found "extensive use of [downward] departures from sentences generated by the career offender provisions."[3] The study found that these departures were "quite substantial," and were often accompanied by disparaging comments about the career offender provisions or about the Commission itself." *Id*. at 357.

Twenty years later, the Sentencing Commission found that the majority of defendants sentenced under the career offender guideline continue to receive below-Guidelines sentences.[4] Moreover, the Commission found that drug trafficking career offenders "are not meaningfully different than other federal drug trafficking offenders" and concluded, "it would be appropriate to restructure the statutory directive and the resulting career offender guideline to distinguish those offenders who are sentenced based solely on an instant drug trafficking offense and two drug trafficking predicates." *Id.* at 27. That restructuring never occurred, nor were other amendments to the rest of the Guideline implemented.

Courts of Appeals across the country have repeatedly upheld the right of district courts to vary downward from the career offender guideline. In *United States v. Martin*, 520 F.3d 87, 96 (1st Cir. 2008), the First Circuit explained that the Supreme Court's decision in *Kimbrough* "opened the door for a sentencing court to deviate from the Guidelines in an individual case even though that deviation seemingly contravenes a broad policy pronouncement of the Sentencing Commission." *Id.* at 96. The Second Circuit has also observed that, "Congress did not intend § 994(h) to deprive the courts of authority to impose on a career offender a prison term that is not near the statutory maximum."

---

[3] Michael S. Gelacak, et al., *Departures Under the Federal Sentencing Guidelines: An Empirical and Jurisprudential Analysis*, 81 Minn. L. Rev. 299, 356 (Dec. 1996).

[4] U.S. Sentencing Commission, *Report to the Congress: Career Offender Sentencing Enhancements* (Career Offender Report) (2016), at 22 ("During the past ten years, the proportion of career offenders sentenced within the applicable guideline range has decreased from 43.3 percent in fiscal year 2005 to 27.5 percent in fiscal year 2014."), *available at* https://www.ussc.gov/sites/default/files/pdf/news/congressional-testimony-and-reports/criminal-history/201607_RtC-Career-Offenders.pdf (last accessed Dec. 29, 2020).

*United States v. Sanchez*, 517 F.3d 651, 662-65 (2d Cir. 2008); *see also United States v. Boardman*, 528 F.3d 86, 87 (1st Cir. 2008) (remanding to permit district court to consider sentence below the career offender guideline); *United States v. Corner*, 598 F.3d 411, 415 (7th Cir. 2010) (en banc) (vacating sentence in career offender case and affirming district court's ability to reject any guideline on policy grounds).

Indeed, courts throughout the country have not hesitated to disregard the career offender Guideline on policy grounds and grant below-Guidelines sentences to defendants who technically meet the career offender requirements. *See, e.g.*, *Finch v. United States*, 2020 WL 2079301, *9 (D. Mass. Apr. 20, 2020) (approving a policy-based variance from a career offender guideline range of 188-235 months to a sentence of 72 months); *United States v. Valdez*, 77 F. Supp. 3d 1115, 1144-52 (D.N.M. 2014) (reducing a career offender's sentence from a range of 188-235 months to 96 months based on, among other things, his addiction to drugs and the age of one of his qualifying drug priors); *United States v. Person*, 377 F. Supp. 2d 308, 310 (D. Mass. 2005) (reducing a career offender's sentence from a range of 262-327 months to 84 months in light of the defendant's childhood psychological injury and potential for rehabilitation, and because "the career offender status would grossly overstate the seriousness of the defendant's criminal history"); *United States v. Hubbard*, 369 F. Supp. 2d 146, 147-48 (D. Mass. 2005) (reducing a career offender's sentence from a range of 188-235 months to 108 months based on his traumatic childhood and resulting Post Traumatic Stress Disorder).

The Ninth Circuit has affirmed that sentencing courts are free to vary from the career offender guideline where appropriate. *United States v. Stewart*, 761 F.3d 993, 1004 (9th Cir. 2014); *United States v. Mitchell,* 624 F.3d 1023, 1030 (9th Cir. 2010). This recognition of district courts' authority matters a great deal still, given the Guideline's continuing drastic effect on a defendant's Guideline range, either by automatically increasing the offense level, the criminal history category to VI, or both (as in this case). Notably, the median low-end Guideline range (*not* sentence imposed) for career offenders in fiscal year 2019 was 188 months—2.7 times the non-career offender median of 70

months.[5] The impact of the career offender Guideline thus persists for the 76.8% designated as career offenders, including Mr. Sandifer, because of drug convictions. *Id.* Even though district courts are now free to vary from the career offender Guideline, the sentences imposed reflect that the Guideline continues to "influence . . . the sentence that the court will impose" by "anchoring" the sentence to the higher Guideline range. *Peugh v. United States*, 569 U.S. 530, 545, 549 (2013).

According to data from 2010 to the present from the U.S. Sentencing Commission, career offenders in the Ninth Circuit who were similarly situated in terms of charges to Mr. Sandifer, while consistently receiving far less than the Guideline suggests, still received very long sentences. In particular, those convicted of a § 924(c) violation, and facing a five-year mandatory minimum as well as additional drug or guns charges, received sentences of between 60 and 151 months.[6] *See* Tarasyuk Decl., ¶ 8 (Group A). For this group, the mean sentence was approximately 106 months, and the third quartile (at the higher end of the range of received sentences) was 120 months. *Id.* Mr. Sandifer's request for a 138-month sentence is thus on the high end of this range.

For career offenders who were convicted of a § 924(c) violation, as well as guns or drugs charges, and faced *more serious* charges than Mr. Sandifer—including mandatory-minimum charges of more than five years, with no upper limit imposed—the range of sentences received was between 86 and 180 months in the Northern District of California, and 60 and 324 months in the Ninth Circuit. *Id.* (Group B). The mean for this group that includes defendants facing more serious charges was approximately 138 months in the Northern District of California, and 145 months in the Ninth Circuit. *Id.* According to a comprehensive national analysis by the Sentencing Commission in 2016, the average sentence imposed for defendants, such as Mr. Sandifer, "who have either a drug trafficking or violent instant offense of conviction and any combination of violent and/or drug

---

[5] U.S. Sentencing Commission, Individual Datafiles FY2019 (drawing from the eight major offense types found among career offenders: murder, sexual abuse, assault, robbery, arson, drug trafficking, firearms, racketeering/extortion), *available at* https://www.ussc.gov/research/data files/commission-datafiles (last accessed Dec. 29, 2020).

[6] This subset of career offender defendants (1) plead guilty to § 924(c) and received full Acceptance of Responsibility, and thus faced Guidelines of 262-327 months, (2) were facing a statutory five-year mandatory minimum, as well as (3) either drug or gun charges under U.S.S.G. § 2K2.1 or § 2D1.1.

1    trafficking prior offenses" was 145 months.[7]

2         The upshot is that a sentence at the low end of the career offender Guideline range of more than

3    20 years, as the government and U.S. Probation recommend, is *way* out of line with the sentences

4    similarly situated offenders receive. The data shows instead that Mr. Sandifer's requested sentence of

5    138 months is actually at the high end of sentences imposed on defendants who plead guilty to the

6    same charges at issue here, and roughly average for defendants who were convicted of even more

7    serious charges that included longer mandatory minimums. When it comes to the career offender

8    Guideline, a within-range sentence is thus a significant outlier—and for very good reason, as further

9    set forth below.

10        But first, a caveat: Mr. Sandifer recognizes, of course, that all this information provides the

11   Court only a rough sense of the range in which similarly situated defendants were sentenced and,

12   although it includes all available data from the Sentencing Commission, likely does not include every

13   single career offender sentenced in the Circuit or this District due to limitations in the data.

14   Unfortunately, it is the best available aggregated information we have about dispositions. The

15   Sentencing Commission data is not tethered to specific case names or numbers, and therefore

16   drawing direct comparison to the specific facts and circumstances of these cases is impossible.

17   However, again, the best available data does show that among reported cases for similarly situated

18   defendants, Mr. Sandifer is requesting a sentence on the higher end of those imposed by other courts

19   in the Northern District of California and Ninth Circuit.

20        **B.    The Career Offender Guideline Does Not Protect Public Safety, Promotes Racial
21              Disparities, and Should Not Be Afforded Much Weight.**

22        It appears that many courts vary downward substantially from the career offender Guideline

23   because it primarily achieves incapacitation rather than public safety, has a disparate impact on

24   African American defendants, and does not otherwise advance the purposes of § 3553(a).

25   Empirically, it has become increasingly clear that the career offender Guideline has contributed

26   significantly to over-incarceration in the federal system. According to the Sentencing Commission,

27

28

---

[7] Career Offender Report at 35 & fig. 14.

DEFENDANT'S SENTENCING MEMORANDUM AND REQUEST FOR DOWNWARD VARIANCE
*SANDIFER*, CR 19–00518 VC

12

career offenders consistently constitute approximately three percent of defendants sentenced each year, however, as a result of the very long sentences they receive, career offenders constituted over 11 percent of federal inmates, at least as of 2016.[8] Four years later, it is fair to expect that they constitute an even greater share of the overall incarcerated population.

Simply put, public safety is not advanced by the career offender Guideline. Research from the Sentencing Commission has now documented that the offenses singled out by the career offender Guideline—both drug-related and violent—do a poor job of identifying which defendants are at the greatest risk of recidivism.[9] Defendants classified as career offenders are automatically placed in CHC VI. But those classified as career offenders actually have lower rates of recidivism than defendants in CHC IV, V, and VI.[10] Thus, the application of the Guideline and attendant imposition of very long sentences is not rationally tied to deterrence data. This overly harsh assessment of those deemed career offenders is even worse for those who qualify as such solely due to drug crimes—their recidivism rate (50%) is virtually equivalent to that of defendants in CHC II (49.4%).[11]

As to offense level, the career offender Guideline is also empirically ill-founded. Many career offenders not only are automatically assigned to the highest criminal history category, as Mr. Sandifer was, but also receive an offense-level enhancement tied to the statutory maximum, as the PSR here indicates. PSR ¶ 28 (applying four-level enhancement due to career offender Guideline). Because the offense level prior to this enhancement is already designed to reflect the seriousness of the instant offense, this increase can only be justified for the purpose of incapacitation.[12] Yet, the

---

[8] Career Offender Report, at 18.

[9] *See* U.S. Sentencing Commission, *Recidivism Among Federal Offenders: A Comprehensive Overview* (2016) (Recidivism Report), at 19 figs. 7A, 7B, *available at* https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2016/recidivism_overview.pdf (last accessed Dec. 29, 2020); U.S. Sentencing Commission, *Recidivism Among Federal Violent Offenders* (2019) (Recidivism: Violent Offenses), at 14 fig. 2.9, 36 fig. 4.7, *available at* https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2019/20190124_Recidivism_Violence.pdf (last accessed Dec. 29, 2020).

[10] Recidivism Report, at 19 figs. 7A, 7B.

[11] Recidivism Report: Violent Offenses, at 14 fig. 2.9 & 36 fig. 47.

[12] Paul J. Hofer & Mark H. Allenbaugh, *The Reason Behind the Rules: Finding and Using the Philosophy of the Federal Sentencing Guidelines*, 40 Am. Crim. L. Rev. 19, 49-50 (2003).

Sentencing Commission has otherwise found "no apparent relationship" between offense levels and recidivism risk.[13] The enhancement therefore cannot be justified from a public safety perspective.

Perhaps most troubling, the career offender Guideline also had an unwarranted adverse impact on African American defendants, in particular, such as Mr. Sandifer. The Sentencing Commission has concluded that certain statutes and guidelines, including specifically the career offender Guideline, "that have a disproportionate impact on" African American defendants, but "serve no clear sentencing purpose."[14] As the Sentencing Commission itself has recognized, "if a sentencing rule has a significant adverse impact and there is insufficient evidence that the rule is needed to achieve a statutory purpose of sentencing, then the rule might be considered unfair toward the affected group."[15] The disproportionate impact of the career offender guideline on African American defendants arises partly from disparate state and local policing practices. In San Francisco, for example, a 2016 report prepared by the District Attorney's Blue Ribbon Panel on Transparency, Accountability and Fairness in Law Enforcement, found that while African-Americans make up 5.8 percent of the city's residents, S.F. Police Department's monthly data showed that 15 percent of people pulled over for traffic stops were African-American and that African Americans accounted for over 42 percent of all nonconsensual searches following stops.[16] Likewise, in 2019, roughly 61% of the individuals classified as career offenders were African Americans—nearly three times their share of the overall federal defendant population.[17] Given that the government does not always insist on

---

[13] U.S. Sentencing Commission, *Measuring Recidivism: The Criminal History Computation of the Federal Sentencing Guideline*s (2004) at 13, *available at* https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-publications/2004/200405_Recidivism_Criminal_History.pdf (last accessed Dec. 28, 2020).

[14] U.S. Sentencing Commission, *Fifteen Years of Guidelines Sentencing: An Assessment of How Well the Federal Criminal Justice System is Achieving the Goals of Sentencing Reform* (Fifteen Year Review) (2004) at 131-34, *available at* https://www.ussc.gov/sites/default/files/pdf/research-and-publications/research-projects-and-surveys/miscellaneous/15-year-study/15_year_study_full.pdf (last accessed Dec. 28, 2020).

[15] *Id.* at 114.

[16] Report of Blue Ribbon Panel on Transparency, Accountability and Fairness in Law Enforcement (2016) at 28-31, *available at* https://sfblueribbonpanel.com/brp-full-report (last accessed Dec. 29, 2020).

[17] *See* U.S. Sentencing Commission, Individual Datafiles, FY2019. Among all such individuals for whom the Commission received complete information, 20.7% were African American, whereas 61.4% of those deemed career offenders were African American. *Id.*

application of the career offender Guideline at sentencing, and the courts and Probation may also miss its applicability in certain cases, a potential explanation of this disparity is that the career offender Guideline is applied in a discriminatory manner. Unfortunately, the defense is unaware of available data to test this theory directly. However, based on what we do know, it is clear that the career offender Guideline sweeps in far more defendants than is necessary to protect the public or advance the other purposes of sentencing, and that it has an adverse impact on African Americans in particular, as compared to defendants of other races. Mr. Sandifer therefore respectfully submits that application of the career offender Guideline is a form of discrimination against African Americans, and in the terms of § 3553(a), it creates an unwarranted sentencing disparity.[18]

In sum, and for all these reasons, Mr. Sandifer urges the Court not to pay deference to the career offender Guideline because it is overly punitive and primarily designed to incapacitate, rather than advance all of the purposes of § 3553(a). Mr. Sandifer respectfully asks instead that he be sentenced primarily in view of the statutory factors discussed below.

### C.    Seriousness of the Offense, Respect for the Law, and Just Punishment.

The Supreme Court has explained the factors in § 3553(a)(2)(A)—the seriousness of the offense," the need "to promote respect for the law" and "provide just punishment for the offense"— are the sentencing rationale of "retribution." *See Tapia v. United States*, 564 U.S. 319, 326 (2011) ("a court may not take account of retribution (the first purpose listed in 3553(a)(2)) when imposing a term of supervised release") (emphasis omitted). "The goal of retribution" is the "interest[] in seeing that the offender is repaid for the hurt he caused." *Kennedy v. Louisiana*, 554 U.S. 407, 442 (2008). Yet, the Supreme Court has warned "a sentence of imprisonment may work to promote not respect, but derision, of the law if the law is viewed as merely a means to dispense harsh punishment without taking into account the real conduct and circumstances involved in sentencing." *Gall*, 552 U.S. at 54 (quotations omitted).

There can be no question that this was a very serious crime, and the most serious by far that Mr. Sandifer has ever committed. A lengthy sentence is unfortunately warranted, although not nearly

---

[18] *See, e.g.,* Eric P. Baumer, *Reassessing and Redirecting Research on Race and Sentencing*, 30 Just. Q. 231, 247-48 (2013).

the 262 months that the government and U.S. Probation request. Such a sentence is far longer than necessary and more in line with sentences handed down where the defendant has been convicted of murder charges than an attempted assault with a deadly weapon. To be sure, Mr. Sandifer did recklessly fire a gun in the Tenderloin and could have easily hurt someone, but he did not attempt to murder the drug dealer who threatened him on the street. The surveillance video produced by the government in this case does not show the position of the seller relative to Mr. Sandifer when the shot was fired—only Mr. Sandifer is visible in the frame. No witness claimed that Mr. Sandifer attempted to kill the other man. Instead, although basically unknown, it appears that the bullet likely hit a cement wall on the other side of the street. Rizk Decl. ¶ 5. Notably, Mr. Sandifer did not chase or follow him. Instead he quickly left the area, realizing the gravity of his mistake. It would therefore be unfair to conclude that Mr. Sandifer intentionally attempted to kill the other man. He denies that was his intention and deeply regrets his impulsive overreaction.

Nor was this a dispute over drug sales territory, which would be more culpable. Although Mr. Sandifer plead guilty to possessing a middling quantity of heroin (25 bindles) with the intention to sell it, he is not a major drug dealer with territory on the street in the Tenderloin. He is an addict who sold sporadically throughout his life solely to sustain his addiction. Here, he was caught possessing drugs for sale, not actually selling them, and no drugs exchanged hands immediately prior to the shooting. Instead, the evidence points to what Mr. Sandifer has himself admitted: a quarrel over a bad dose of dangerous drugs, followed by a threat, led Mr. Sandifer to dangerously overreact. Not only Mr. Sandifer's own admissions, but also the video of the offense, the apparent trajectory of the shot, and the neuropsychological evaluation of Mr. Sandifer, and his documented drug use, all support his account and help to explain why Mr. Sandifer was so reckless in his behavior.

A substantial sentence of 138 months fully accounts for this behavior and punishes Mr. Sandifer severely. As noted above, Mr. Sandifer's most serious prior conviction resulted in a sentence of four years, and he served only half of that in actuality. A sentence of 138 months is a dramatic increase in punishment—by nearly six-fold—over the penalties he has faced in the past. That said, a 138-month sentence is also commensurate with the conduct here, which is concededly the most reckless and dangerous of Mr. Sandifer's life. Though Mr. Sandifer has one prior conviction for

misdemeanor domestic violence, it dates from when he was 21 years old and it was not sufficiently serious to warrant a custodial sentence (he received only probation). PSR ¶ 36. That case is his *only* prior violent conviction. He has no prior convictions for guns, and only began carrying one after he was the victim of attempted carjacking in which he was shot.

Notably, Mr. Sandifer related to counsel when he first arrived to be arraigned, that he had been offered a deal of five years by District Attorney George Gascón, with half of that time actually to be served. Rizk Decl., ¶ 6. This was not a particularly lenient offer—it was middle of the road. Such a disposition is exactly in line with sentences that state defendants typically receive for violations of Penal Code § 245(a)(2), for assault with a firearm, the penalty for which is set statutorily at two, three, or four years. *See* Cal. P.C. § 245(a)(2). Before Mr. Sandifer could accept that offer, the U.S. Attorney's Office indicted Mr. Sandifer and took him into federal custody (his state case was subsequently dropped).

Also significant for sentencing purposes, Mr. Sandifer is not a member of a gang or any organized drug trafficking organization. Rather, he is longtime user of heroin and cocaine, who at the time of the offense was living out of his car and nursing his own habit. All of his other crimes related to drug sales, and ultimately, his own addiction. Although Mr. Sandifer certainly does carry a lot of emotional trauma that has at times manifested as anger and impulsivity, he is not a naturally violent person. He has attempted to lead a semi-normal life during periods of his life when he was able to maintain relationships and even work on and off despite a terrible, multi-decade addiction to heroin and cocaine.

It should be clear from the record in front of the Court that Mr. Sandifer is not a sociopath who deserves to lose two decades, or even 15 years, of his life to prison. As the PSR and neuropsychological evaluation reveal in detail, he is a damaged person who failed to find help for himself. He was subject to terrible physical and emotional abuse starting as a child at the hands of his father. He was also witness to serious domestic violence directed at his mother, which left him feeling permanently inadequate and vulnerable, according to his neuropsychological evaluation. Later, as a result of further traumas, including witnessing killings and being shot himself, he became hypervigilant and defensive. Drugs came into Mr. Sandifer's life early and he learned to rely on them

as a coping mechanism. Sadly, it goes without saying that folks like Mr. Sandifer who grew up during the crack epidemic and worst days of violence in East Oakland neighborhoods did not have any real chance of getting access to therapy, antidepressants, or other pro-social means for coping with the traumas in their lives. Observing as much does not excuse what occurred here in any sense, but it does distinguish Mr. Sandifer from those who were raised in similarly disadvantaged backgrounds and, much more culpably, elected to join a street gang, as well as better-off defendants who committed equally serious crimes.

Finally, and perhaps most significantly in terms of just punishment, a 138-month sentence will have the effect of denying Mr. Sandifer the opportunity to see his daughter graduate and his young grandchildren grow up. During the pendency of this action, Mr. Sandifer returned to this issue again and again as he came to terms with the penalty he faces and his regrets over his conduct. Ten more years of custody on top of what he has already served, far from his family, will set him apart from society and the environment in which this occurred and will unquestionably and inalterably punish Mr. Sandifer. He respectfully submits that a 138-month sentence in this matter is sufficient punishment, consistent with the mandate § 3553(a).

### D.      Deterring Criminal Conduct and Protecting the Public.

Another decade in prison will put Mr. Sandifer nearly into his fifties when he is released and ensure that he undergoes a *substantial* period of sobriety and programming at the Bureau of Prisons (BOP) before he is released to his family to assist in reassembling his life. Such a sentence is sufficient to deter Mr. Sandifer from engaging in criminal conduct in the future. As set forth above, the Sentencing Commission's data does not support the view that imposing a much longer sentence, such as the government and Probation urge, will prevent recidivism and protect public safety. Indeed, the data shows that career offenders, presumably due to the long sentences they receive, recidivate *less often* than defendants who otherwise fall in CHC IV, V, or VI.[19] The Sentencing Commission's

---

[19] Recidivism Report, at 19 figs. 7A, 7B. Probation specifically argues that, despite the mitigating impact of his history of physical abuse and drug addiction, Mr. Sandifer's criminal history justifies a career offender Guideline sentence in order to ensure public safety. In addition to overlooking the Sentencing Commission's data undermining that theory, Probation also fails to consider that with just two drug trafficking prior convictions, Mr. Sandifer has the *least serious* criminal history possible

1
2

analysis also suggests that Mr. Sandifer has a relatively low likelihood of recidivating due to his advancing age—again, he will be in his fifties after another decade passes and he is finally released.[20]

3
4
5
6
7
8
9
10
11
12
13
14
15
16

      Backing up the statistics, there are good reasons to believe that another ten years in prison will make a difference in Mr. Sandifer's life, in particular. The majority of Mr. Sandifer's criminal conduct occurred during his twenties. During that period, he actually served: 18 months (three years at half time) at age 20, PSR ¶ 35; two years (four years at half time) at age 26, *id.* ¶ 37; and 18 months at age 29-30, *id.* ¶ 35. Immediately prior to this case, Mr. Sandifer had gone for nearly a decade without committing a crime—his last conviction prior to this one was for marijuana in 2011, when he was thirty years old. PSR ¶ 39. For that case he actually served eight months in county jail. *Id.* Mr. Sandifer was not on parole or probation at the time of the instant offense. Instead, he had been discharged from five years of state probation from his marijuana case in 2017, with no probation violations. *Id.* During the last decade, concededly, Mr. Sandifer has continued to struggle with his addiction in secret, but he also was making significant efforts to turn his life around. He pursued a serious relationship (which was unfortunately ruined by his drug use and pilfering money to pay for his habit), and worked steadily at a variety of jobs, including most recently at the YMCA, from 2010 up until his arrest in this case. PSR ¶¶ 68-72.

17
18
19
20
21
22
23
24
25

      Upon his release, Mr. Sandifer will have support from his family, which should enable him to resume his rehabilitation. Promisingly, his brother Antwon has offered him employment and a suburban place to live near Sacramento, far from the Oakland and San Francisco neighborhoods where Mr. Sandifer succumbed to drugs and crime. With the passage of another decade of sobriety in custody, the likelihood that Mr. Sandifer will reoffend while living and working with his brother during his fifties is fairly minimal, provided he remains sober. Of course, he will be tested by Probation during supervision to ensure he remains clean—probably the most important factor of all in guaranteeing that Mr. Sandifer does not reoffend. If he does struggle, of course, the Court will retain

26
27
28

that still qualifies him as a career offender. He has no prior crimes of violence, and no additional prior qualifying drug trafficking convictions. Thus, his criminal history actually places him among the least dangerous career offenders.

[20] Recidivism Report, at 23 fig. 11.

DEFENDANT'S SENTENCING MEMORANDUM AND REQUEST FOR DOWNWARD VARIANCE
*SANDIFER*, CR 19–00518 VC

considerable discretion to impose conditions of release, as well as revoke supervised release should he violate those conditions.

Ultimately, this case has already had a profound impact on Mr. Sandifer. Having served just about two years of custody for his most serious prior conviction back when he was in his mid-twenties, now he has served nearly as much time already at Santa Rita Jail in very harsh conditions during the COVID-19 pandemic—while contemplating the imposition of a longer sentence during that extended period.[21] The wait has been extremely hard on him, to say the least. He has had a lot of time to consider the meaning of deterrence, the gravity of his mistake, and the consequences for him personally, as well as, of course, for his family. Looking at another decade of prison time or more, Mr. Sandifer is amply deterred from recidivating. He is profoundly regretful, deeply affected by the loss of his own lifetime that will result from a long sentence, and equally, focused on his desire to spend the remains of his years following his sentence peacefully and soberly trying to reconstitute a meaningful life. He intends to address the Court at sentencing on the impact of this case on him and his determination to free himself of drugs and never reoffend.

### E.      Providing Training, Medical Care or Other Treatment.

"The underlying purposes of sentencing include not only punishment and deterrence, but also the provision of treatment to a defendant in need of it." *United States v. Bad Marriage*, 392 F.3d 1103, 1114 (9th Cir. 2004) (citing 18 U.S.C. § 3553(a)(2)(D)). As the background section of this memo sets forth, Mr. Sandifer has personally endured significant traumas throughout his life that have largely gone untreated, and instead led to his decades-long drug addiction starting as a child, and his criminal conduct—which has all been driven by drugs. With his addiction and mental health addressed through programming in custody and support on supervised release, he is unlikely to reoffend. Effective treatment, not more time, thus better serves the purposes of § 3553(a)(2)(D).

Further, a sentence of 138 months in custody is more than sufficient to provide Mr. Sandifer with the rehabilitation and treatment he needs in BOP's custody.[22] Mr. Sandifer will have ample time

---

[21] Mr. Sandifer elected to delay sentencing in July in favor of an in-person hearing, but after waiting so long, understandably decided to change course and proceed via video since there was no clear timeframe for proceeding in person.

[22] Mr. Sandifer would have been participating in drug addiction treatment classes throughout his time

to complete BOP's Residential Drug Abuse Program (RDAP), even though he will not receive any reduction in his sentence for completing the program due to his § 924(c) or § 922(g) convictions. Mr. Sandifer will need supportive drug counseling when he is released, of course, and welcomes such assistance. *Id.* He also requests a condition of mental health counseling, which is clearly warranted given his history of untreated trauma. PSR ¶ 63.

Also relevant, of course, is the fact that Mr. Sandifer is serving significant time during the ongoing COVID-19 pandemic. As the Court knows, the pandemic has significantly upended Santa Rita and BOP operations and resulted in the suspension of programming and social visits, with inmates often placed on quarantine and confined to their cells to slow the spread of the virus. This appears unlikely to change anytime soon. In November, the Associated Press reported, based on internal BOP documents it obtained, that "[t]he federal prison system will be among the first government agencies to receive the coronavirus vaccine, though initial allotments of the vaccine will be given to staff and not to inmates, even though sickened prisoners vastly outnumber sickened staff."[23] A BOP spokesman recently confirmed that it was offering the vaccine to BOP staff, and also claimed that some "high risk inmates in a few of the BOP facilities in different regions of the country have received the vaccine"—but refused to answer questions about how many inmates had been vaccinated, where they were housed, how they were determined to be "high risk," or even how many doses of the vaccine BOP has received.[24]

Thus, not only had Mr. Sandifer served time during one of the most difficult periods in custody in recent history, he is likely to remain at risk of catching COVID-19. Thankfully, Mr. Sandifer has no known risk factors recognized by the CDC. Nevertheless, conditions remain grim. As BOP Director Michael Carvajal told Congress this summer, "prisons are not designed for social distancing.

---

in Santa Rita Jail, but they were cancelled due to the pandemic. PSR ¶ 65.

[23] Michael Balsamo and Michael Sisak, "Federal prisons to prioritize staff to receive virus vaccine," *Associated Press*, Nov. 23, 2020, *available at* https://apnews.com/article/coronavirus-pandemic-prisons-85361fcf7cda33c7b6afb5ad8d2df8a2 (last accessed Dec. 29, 2020).

[24] Michael Balsamo, "Reversing course, feds say some US inmates get virus vaccine," *Associated Press*, Dec. 22, 2020, *available at* https://apnews.com/article/coronavirus-pandemic-prisons-d2c1a3013351ed42cf75a194e4661cf3 (last accessed Dec. 29, 2020).

In fact, they are designed for just the opposite."[25] Unsurprisingly, the COVID-19 infection rate within prison far outpaces the infection rate in the United States. A recent research letter in the Journal of the American Medical Association found the COVID-19 case rate for prisoners of 3,251 per 100,000 prisoners was 5.5 times higher than the U.S. population case rate of 587 per 100,000.[26] Worse, the adjusted death rate from COVID-19 for inmates was *three times* higher than would be expected if age and sex distributions of the U.S. and prison population were equivalent. *Id.* Mr. Sandifer thus faces significant



ongoing health risk in custody for the foreseeable future. Although it is impossible to put a "price" in terms of custodial time on the health risks, stress, and isolation that inmates serving time now must endure, it is worth pointing out that Mr. Sandifer's requested sentence constitutes a relatively modest 22-month downward variance from the lengthy "natural" Guideline sentence of 160-185 months. Some variance is appropriate in view of the pandemic, as well as the significant history of physical and emotional abuse and addiction Mr. Sandifer has suffered, and for which he clearly requires treatment.

In sum, a 138-month sentence is surely more than sufficient to rehabilitate Mr. Sandifer, and takes into account also the hardships he has endured throughout his life and during the COVID-19 pandemic.

**F.     Avoiding Unwarranted Sentencing Disparities.**

While the Court must avoid unwarranted sentencing disparities among defendants with similar records convicted of similar conduct, the Ninth Circuit has explained sentencing courts must also

[25] *See* June 2, 2020 Statement of Michael D. Carvajal Before the Committee on the Judiciary of the United States Senate for a hearing on "Examining Best Practices for Incarceration and Detention During COVID-19" at 5, *available at* https://www.judiciary.senate.gov/imo/media/doc/Carvajal-Allen%20Joint%20Testimony.pdf (last accessed Dec. 29, 2020).

[26] Saloner, et al., "COVID-19 Cases and Deaths in Federal and State Prisons," *JAMA*, Jul. 8, 2020, https://jamanetwork.com/journals/jama/fullarticle/2768249 (last accessed Dec. 29, 2020).

"avoid 'unwarranted similarities among [defendants] who were not similarly situated.'" *United States v. Amezcua-Vasquez*, 567 F.3d 1050, 1058 (9th Cir. 2009) (quoting *Gall,* 552 U.S. at 55 (emphasis and brackets in original)); *see also* 18 U.S.C. § 3553(a)(6).

A downward variance to 138 months ensures that Mr. Sandifer is not treated disparately in several ways, as outlined above. First, 138 months is well within the range of what other career offender defendants who have plead guilty to the same crimes have received in the Northern District of California and the Ninth Circuit—indeed it is at the high end of those ranges, recognizing that the relevant conduct here is very serious. *See* Tarasyuk Decl., ¶ 8 (Group A). Similarly, 138 months is very near to the average sentence received by a broader pool of career offenders who were convicted of similar crimes, including more serious charges with 10-, 15-, and 20-year mandatory minimums. *Id.* (Group B). To sentence Mr. Sandifer to a much longer sentence, as the government and Probation urge, would result in an unwarranted disparity as compared to other similar career offender defendants. Worse, to sentence Mr. Sandifer under the career offender Guideline would further perpetuate the significant adverse and unjustified impact of the Guideline on African Americans, as compared to other defendants.

Such a long sentence would also create, in the terms of *Amezcua-Vasquez*, "unwarranted similarities" among dissimilar defendants. As noted above, Mr. Sandifer did not commit murder or attempted murder, and yet that is the type of sentence recommended by the government and Probation. Finally, the contemplated sentence of 138 months is also *far longer* than the sentence he was offered by the District Attorney's Office, and far longer than similar defendants typically receive for firearm assault cases in state court. Of course, the U.S. Attorney's Office exercised its discretion to bring federal charges which come with more draconian penalties, but Mr. Sandifer should not be subjected to a sentence that is overly harsh even by federal standards.

By any measure, 138 months is a very long sentence that recognizes the seriousness of the offense, but ultimately, is in line with what other federal defendants have received in similar cases.

## VI. CONCLUSION

For all the reasons set forth above, Mr. Sandifer respectfully asks that the Court sentence him to 138 months, followed by three years of supervision.

1

2     Dated:      December 31, 2020                Respectfully submitted,

3
                                                   STEVEN G. KALAR
4                                                  Federal Public Defender
                                                   Northern District of California
5
                                                   _____/S_____
6                                                  DAVID W. RIZK
                                                   Assistant Federal Public Defender
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28